Richmond J. Reese, in His Own Behalf, and All Other Certificate Holders of Defendant, Similarly Situated, Who Will Come in and Contribute to the Expense of This Action, Respondent, Impleaded with Arline E. Thompson and Others, Intervenors, Respondents, Appellants; John W. Hahn and Others, Intervenors, Respondents, Appellants, and Charles W. Leonard and Others, Intervenors, Respondents, *v.* Pinelawn Cemetery, Appellant, Respondent.

First Department, December 24, 1934.

*Charles H. Kelby* of counsel [*Kahn & Zorn*, attorneys], for the defendant Pinelawn Cemetery.

*William L. Woodward* of counsel [*Parmly, Stetson & Woodward*, attorneys], for the plaintiffs Arline E. Thompson and others.

*Paul T. Kammerer, Jr.*, of counsel [*Dyer & Kammerer*, attorneys], for the plaintiffs John W. Hahn and others.

*Elizabeth M. Graham* of counsel [*Emmet, Marvin & Martin*, attorneys], for the plaintiffs Charles W. Leonard and Joseph W. Graham.

*Richmond J. Reese* [*Alexander J. Lindsay* with him on the brief; *Richmond J. Reese*, attorney], plaintiff in person.

*Thomas K. Mahlon*, for the plaintiff Bankers Trust Company of New York.

GLENNON, J.  This action was originally brought by plaintiff, Richmond J. Reese, as a holder of certificates of the land purchase shares of Pinelawn Cemetery, in his own behalf, and in behalf of all other certificate holders similarly situated, who might join in the action as plaintiffs, to compel the Pinelawn Cemetery to render an account of its proceedings from July 1, 1913, to date.  Subsequently, the other plaintiffs, whose names appear in the title, joined in the action and have aided in its prosecution.

Pinelawn Cemetery was organized in 1902, and is the owner of a tract of land consisting of about 1,800 to 2,000 acres in the town of Babylon, Long Island. The history of the corporation has been discussed on other occasions. (See *Tyndall* v. *Pinelawn Cemetery,* 198 N. Y. 217; *Matter of Chauncey,* 191 App. Div. 359.) Since on this appeal questions of law solely, such as arise on exceptions to an account, are involved, we deem it necessary to set forth only such pertinent facts as bear directly upon the questions here presented.

In the interlocutory judgment entered herein on December 16, 1929, a referee was appointed to report the facts, showing in what manner Pinelawn Cemetery has disposed of its lands, and the disposition made of all proceeds arising therefrom which belong to the land purchase fund, since the date of the last accounting made by the cemetery in the year 1913. The referee was further directed to ascertain and report the amount that each of the holders of the land purchase certificates of Pinelawn Cemetery was entitled to receive from one-half of the gross proceeds of the sale of land, lots or plots.

Hearings were held before the referee over a period of two years. On August 1, 1932, he filed his opinion and report, and the latter was confirmed at Special Term. Exceptions were filed to the report, and it is with these exceptions that we are now concerned.

After its organization, Pinelawn Cemetery issued land purchase certificates pursuant to the provisions of the Membership Corporations Law. There are now outstanding 127,850 shares, and these are owned by approximately 1,400 holders. The certificates, in form, with the exception of the name and number of shares, are the same as the following, which was issued to plaintiff Reese:

" 100            100
  Shares            Shares
    " Number        Shares
      1954          100

" PINELAWN CEMETERY

" Incorporated under the Laws of the State of New York.

" Limited to 127,850 Shares.

" This Is to Certify That Richmond J. Reese is entitled to One Hundred Shares interest in one-half of the gross proceeds of sale of the use of lots in Pinelawn Cemetery.

" This certificate is a lien on the land-purchase fund of Pinelawn Cemetery, which fund shall be composed of one-half the gross proceeds of the sale in due and natural course of burial lands in said cemetery and the holder hereof is entitled to have paid over to him such proportion of said fund as the number of shares in said cemetery held by him bears to the entire number of such shares

appearing in this certificate and will be so entitled until the last burial lands in said cemetery are sold and their proceeds distributed according to the terms hereof.

" It is further understood between the holder of this certificate and Pinelawn Cemetery that said cemetery is in nowise indebted to such holder, but acts merely as the collector and distributor of the land-purchase fund herein described, according to the terms hereof, with such liabilities only as attach to the proper discharge of the trust reposed in it by such holder.

" This certificate is transferable only on the books of Pinelawn Cemetery in person or by attorney on surrender of this certificate.

" *In witness whereof*, the said Pinelawn Cemetery has caused this Certificate to be signed by its President and Treasurer and its corporate seal to be thereto affixed this twelfth day of December, 1911.                                     A. C. DEGRAW, *President.*

" N. H. LOCKE, JR., *Treasurer,*
    " Registered Dec. 13, 1911.
            " HAMILTON TRUST COMPANY, *Registrar,* .
                        " By G. E. OPPENHEIMER, *Secretary.*
" Countersigned. . . . . . . . . . . . . . . . . . . . . . . . .
                        " *Secretary.*"

In *Tyndall* v. *Pinelawn Cemetery* (*supra*) the Court of Appeals considered the rights of the holders of certificates of this type, and held that, whether the relationship was one of trustee and beneficiary or principal and agent, a holder was entitled to an accounting since he had a lien on the land-purchase fund.

In 1915 the corporation was placed in the hands of receivers. On May 29, 1916, in order to raise funds to pay off the then indebtedness, which amounted to about $250,000, a letter was addressed to the shareholders requesting that they waive their share in the proceeds of a proposed sale of a tract of 400 acres of the corporation's property. The waivers which were signed by some of the shareholders read as follows:

" I, the undersigned, owning. . . . . . . . . . .land purchase shares of Pinelawn Cemetery, hereby authorize and empower the officers and directors to sell 400 acres of its land and apply the proceeds to the full payment of all its obligations and I hereby authorize them to use my proportionate share of the gross proceeds of the sale of the said 400 acres for this purpose.                           .
                        " Name. . . . . . . . . . . . . . . . . . . . . . . .
                        " Address. . . . . . . . . . . . . . . . . . . . . .
" Witness. . . . . . . . . . . . . . . . . . . . .
" Dated. . . . . . . . . . . . . . . . . . . . . . "  .

From 1916 to 1928 efforts were made by the corporation to sell the 400 acres, but without success. Difficulties were encountered with respect to the transfer of a valid title. In 1928 the Legislature came to the aid of the corporation and passed an act permitting it to sell land in fee for the purpose of clearing its indebtedness. In the same year the corporation sold the 400 acres to three other cemetery corporations for the total price of $625,000.

Between the years 1913 and 1928, in the regular operation of its business, the corporation also sold burial plots for an aggregate price of approximately $20,000.

The corporation did not distribute the proceeds of these sales.

The first question to be determined on this appeal is the interpretation of the term " gross proceeds of sale." The certificate quoted above reads that " Richmond J. Reese is entitled to One Hundred Shares interest in one-half of the *gross proceeds of sale* of the use of lots in Pinelawn Cemetery."

Section 50 of the Membership Corporations Law (Laws of 1895, chap. 559), pursuant to which the certificates were issued, provides: " Such corporation may agree with a person from whom any lands are purchased for a cemetery, to pay therefor a specified share not exceeding one-half of the proceeds of all sales of the use of lots and plats made from such land, and such share shall be first applied to the payment of such purchase-money, and the residue thereof shall be applied to the preservation, improvement, and embellishment of the cemetery, and the incidental expenses of the corporation. Where lands have been so purchased, and are to be paid for as provided by this section, the prices of the use of lots and plats fixed by the directors and in force when such purchase was made, shall not be changed, while the purchase-price remains unpaid, without the written consent of a majority in interest of the persons from whom the lands were purchased, their heirs, rpresentatives or assigns."

Section 50 subsequently became section 70 of the same law by the consolidation made in 1909 (Laws of 1909, chap. 40).

Section 70 is now section 87 and reads in part: " Such corporation may agree with a person from whom any lands are purchased for a cemetery, to pay therefor a specified share not exceeding *one-half of the proceeds of sales* of lots therein or the use thereof, and such share shall be applied to the payment of such purchase-price, and the *remainder* to the preservation, improvement and embellishment of the cemetery, and the expenses and liabilities of the corporation; in such case the prices of lots or the use thereof in force when such purchase was made, shall not be changed, while the purchase-price remains unpaid, without the written consent of a majority in interest

of the persons from whom the lands were purchased or their legal representatives." (Italics ours.)

The plaintiffs, appellants, contend that the expression " one-half of the proceeds," used in section 50 (now section 87) of the Membership Corporations Law, must be construed to mean one-half the gross proceeds of sales without any deduction. The referee has ruled that the certificate holders are only entitled to one-half the net proceeds of the sales, or, in other words, that certain deductions are allowable before the certificate holders' share is determined. We believe that the referee reached a correct conclusion. While the certificate provides that the holder is entitled to an interest in a certain number of shares of one-half the *gross proceeds* of sale, still we cannot overlook the wording of the statute which provides, in effect, that not more than one-half of the proceeds of sales shall be applied to payment of the purchase price, whereas the remainder is to be used for the preservation, improvement and embellishment of the cemetery.

In *American Exchange National Bank* v. *Woodlawn Cemetery* (194 N. Y. 116, at p. 124) Judge GRAY said: " It was not within the corporate powers of such associations to obligate themselves absolutely with respect to the proceeds of sales, or otherwise than by the certificates of indebtedness of the statute. They could not issue certificates of stock, as might stock corporations, for they had no capital stock. They were under restrictions, which entered into the fundamental law of their being. Authority to do acts, which might increase the corporate liabilities, could, alone, be conferred by the Legislature of the State and the exercise of an unauthorized power on the part of their officers, honestly, or fraudulently, would be illegal and void. The powers of the corporation could not rise beyond the legislative source and the wise scheme of the Legislature, for a restriction of the corporate liability, by limiting what the corporation might do, and for the maintenance of a fund for the benefit of lot owners, could not be defeated by acts in excess of powers conferred."

Furthermore, this same question was passed upon by a referee in the accounting proceeding of 1913, and his report thereon was subsequently confirmed at Special Term of the Supreme Court.

A question is presented as to the validity and effect of the waivers. Some of the plaintiffs attack the waivers on the theory that they are invalid for lack of consideration. In this they are in error. We agree with the conclusion reached by the referee that there was ample consideration.

The claim is also made that since the waivers were signed in 1916 and the sales did not take place until 1928, they are " voidable,"

because they were not acted upon by the cemetery association within a reasonable time. The difficulty with this contention, as we see it, is that no limitation as to time was fixed in the waivers and no such claim was advanced at any time until long after the necessary legislation permitting a sale of the acreage had been passed and the association, relying in part upon the waivers, had consummated the sales.

We now consider the effect of the waivers in so far as they apply to the payment of the corporate debts. Our opinion is that the corporation first had to apply the amount of *its share* of the proceeds of the sales. Then, if a deficiency still remained, it was empowered under the terms of the waivers to draw upon the shares of those who had signed them, *but only to the extent necessary* to pay the amount of the deficiency. If, after so doing, it was unnecessary to use the entire amount of the shares of the waiving certificate holders, any surplus should be distributed ratably among them.

It must be remembered that the sales of acreage was specifically authorized by chapter 696 of the Laws of 1928 in order to help this cemetery " to satisfy its debts and liabilities, or any portion thereof." The same act provided with regard to certificate holders that " their rights shall be preserved by the corporation setting aside that portion of the proceeds of the sale of land, to which they may be entitled." The proceeds of these sales under the enactment of 1928 were exempted in part from the provisions of the Membership Corporations Law, *supra*, in that the corporation was not to use any portion thereof for the " preservation, improvement and embellishment of the cemetery."

The next point to be considered is the number of waivers. The officers have stated that eighty per cent of the certificate holders signed and returned waivers. There is no proof in the record to establish this statement as a fact. Some twelve waivers were put in evidence by the plaintiffs, totaling only 2,170 shares, whereas eighty per cent amounts to approximately 100,000 shares. Facts, not mere conclusions, should have been proven on the trial, if the corporation is to have benefit of these waivers. Furthermore, the interlocutory judgment provided: " That the said Referee shall further ascertain and report the names and addresses of all the holders of the land purchase certificates of the defendant Pinelawn Cemetery and the amount that each of said holders is entitled to receive from the one-half of the gross proceeds of the sale of land, lots or plots and the use of the same."

This direction was not followed. The referee's report finds certain named amounts due to those owners of land-purchase certificates who intervened in the action and whose total holdings

do not exceed 10,000 shares. With respect to all other holders of certificates, the referee has merely made a general finding. This we deem not to be a proper fulfillment of the provision of the judgment.

We now pass to the question of interest. The referee allowed six per cent interest upon the certificate holders' share in the proceeds withheld by the corporation. The latter contends that the certificate holders are not entitled to interest at six per cent for two reasons: *First,* the delay was justified because of litigation with the town of Babylon over the cemetery's underlying titles; *second,* the cemetery did not put the money into its general fund and have its use for general purposes. There is no merit to either one of these contentions. Litigation with the town of Babylon was no excuse. Consequently, we believe that an allowance of six per cent interest was proper under the circumstances.

The other exceptions to the referee's report are not well founded, and consequently do not merit any lengthy discussion.

It is well nigh impossible to pass upon the question of an extra allowance and counsel fees on this appeal, since extra labors will have to be performed in ordinary course. However, we hold that the court at Special Term has the power to grant an extra allowance and counsel fees in an action of this type.

The judgment should be modified by remitting the matter to a referee to proceed in accordance with this opinion and report to the court at Special Term, and as so modified affirmed, with costs to the plaintiffs, appellants, against the defendant to abide the event.

FINCH, P. J., MARTIN, O'MALLEY and TOWNLEY, JJ., concur.

Judgment modified by remitting the matter to a referee to proceed in accordance with opinion and report to the court at Special Term, and as so modified affirmed, with costs to the plaintiffs, appellants, against the defendant to abide the event. Settle order on notice.